# United States Court of Appeals for the Federal Circuit

06-1109

RON STEEN,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Joel D. Kaufman, Steptoe & Johnson, LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief was Tina Potuto Kimble.

David S. Silverbrand, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Jeffrey Kahn, Attorney, Office of General Counsel, United States Department of Agriculture, of Washington, DC.

Appealed from: United States Court of International Trade

Judge Evan J. Wallach

# United States Court of Appeals for the Federal Circuit

06-1109

RON STEEN,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  November 20, 2006

_____

Before BRYSON, <u>Circuit Judge</u>, ARCHER, <u>Senior Circuit Judge</u>, and GAJARSA, <u>Circuit Judge</u>.

BRYSON, <u>Circuit Judge</u>.

Ron Steen, a commercial fisherman, seeks review of a ruling by the Court of International Trade upholding the decision of the Department of Agriculture denying his application for a "trade adjustment assistance" cash benefit.  We affirm.

I

A

The Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (1975), provides for various forms of trade adjustment assistance for U.S. workers harmed by competition from imported goods.  <u>See</u> 19 U.S.C. §§ 2271-2321.  In 2002, Congress amended the statute to extend trade adjustment assistance to "agricultural commodity producers"

similarly harmed by competition from imports, Trade Act of 2002, § 141, Pub. L. 107-210, 116 Stat. 933, 946-53, codified at 19 U.S.C. §§ 2401a-2401g.

In somewhat simplified summary, the pertinent statutory scheme operates as follows: A group of producers of a particular agricultural commodity who feel they have been adversely affected by imports of agricultural products are entitled to file a petition with the Secretary of Agriculture seeking certification of eligibility for adjustment assistance. The Secretary is required to certify the commodity producers for adjustment assistance if the Secretary determines (1) that the national average price for the particular commodity in the most recent marketing year is less than 80 percent of the national average price for that commodity for the five previous years and (2) that increases in imports of that commodity or of goods directly competitive with it have contributed importantly to the price decline. 19 U.S.C. § 2401a(c).

In the event a producer group is certified, any individual producer covered by that group certification is eligible for certain non-monetary benefits, such as free information regarding the feasibility of substituting other commodities for those adversely affected and technical assistance to improve production and marketing of the adversely affected commodities. See 19 U.S.C. § 2401e(a)(1)(D). Each producer covered by a certification may also apply for a trade adjustment allowance, i.e., a cash benefit. To be eligible for that benefit, the producer must submit information establishing, among other requirements, that the producer's "net farm income (as determined by the Secretary) for the most recent year is less than the producer's net farm income for the latest year in which no adjustment assistance was received by the producer." Id. § 2401e(a)(1). The amount of the cash benefit paid to the producer is based on the amount of the

06-1109                                         2

commodity produced by the applicant in the most recent marketing year and the amount by which the market price of the commodity has fallen during that year, relative to the average price during the previous five years. Id. § 2401e(b). The maximum yearly cash benefit for any producer under the program is $10,000. Id. § 2401e(c). Benefits will not be paid to producers having an adjusted gross income above a certain level. Id. § 2401e(a)(2).

Following the enactment of the 2002 Act, the Secretary of Agriculture promulgated formal regulations implementing the statute. See Trade Assistance for Farmers, 68 Fed. Reg. 50,048 (Aug. 20, 2003). In doing so, the Secretary specified that the Act applies not only to farmers but also to certain fishermen. In particular, the regulations make statutory benefits available to domestic fishermen whose catch competes directly with imported aquaculture products and who are adversely affected by those imports. The regulations define aquaculture as farm fishing, or the rearing of marine animals in a controlled environment for human consumption. 68 Fed. Reg. at 50,049; 7 C.F.R. § 1580.102.

Paralleling the statute, the regulations state that any producer of a certified commodity is entitled to free information and technical assistance in adjusting to import competition and may also be eligible for adjustment assistance in the form of cash payments. 7 C.F.R. §§ 1580.301(e), 1580.302. Again paralleling the statute, the regulations require a producer applying for monetary benefits to certify, among other things, that his "net farm or fishing income for the most recent tax year was less than that during the producer's pre-adjustment year." Id. § 1580.301(e)(4). In their original form, the regulations defined "net fishing income" for individuals as "net profit or loss

. . . reported on Internal Revenue Service Schedule C or C-EZ (Form 1040) . . . during the tax year that most closely corresponds with the marketing year under consideration." Id. § 1580.102 (2004). That definition was subsequently amended to omit the reference to Schedule C. In its current form, the pertinent regulation defines net fishing income to mean "net profit or loss . . . reported to the Internal Revenue Service for the tax year that most closely corresponds with the marketing year under consideration." Id. § 1580.102 (2006). Because Mr. Steen's application for benefits and the Secretary's action on that application were both completed before the regulations were revised in November 2004, Mr. Steen argues that the original version of the definitional regulation, not the amended version, applies to his claim. The government does not expressly dispute that contention, and for purposes of this appeal we assume the earlier version of the regulation applies to Mr. Steen's application.

B

In 2003, a group of Pacific salmon fishermen from Washington state successfully petitioned for trade assistance eligibility under the 2002 Trade Act. As a member of that group, Mr. Steen subsequently filed an individual application for monetary benefits. The Secretary denied his application on the ground that he had failed to show that his net fishing income in 2002 was lower than his net fishing income in 2001.

Mr. Steen then filed a complaint in the Court of International Trade challenging the Secretary's denial. He noted that although his income from all commercial fishing ventures increased between 2001 and 2002, his fishing income from the imported commodity in question—Pacific salmon—decreased during the same period. That is, while his net income from all fishing activities increased from $4,573 to $9,915, his

earnings from Pacific salmon fell from $9,885 to $2,631. He argued that under the statute his net fishing income should be calculated with respect to the imported commodity only and should not be calculated by taking into account his income from other commercial fishing activity.

In a thorough opinion, the Court of International Trade rejected Mr. Steen's argument and upheld the Agriculture Department's decision denying his application. We sustain the trial court's ruling and its analysis in all respects.

## II

While he divides his argument into multiple parts, Mr. Steen's legal position boils down to a single proposition: that Congress's reference to "net farm income," as applied to the fishing industry, should be understood to mean net income from the particular commodity for which an adjustment assistance certification has been granted, rather than net income from all fishing activity. As the trial court correctly concluded, that argument is flawed in several respects: it is at odds with the plain meaning of the term "net farm income" (and its regulatory extension, "net fishing income") as well as with other portions of the statute; it is unsupported by the goals Congress intended the statute to promote; and it is contrary to the Secretary's reasonable definition of the statutory term, to which we are obligated to defer.

## A

First, the terms "net farm income" and "net fishing income" are not easily read to mean "net income from a single commodity" as applied to a farmer or fisherman whose income derives from multiple commodities. The natural way for Congress to express that narrower concept would have been to refer to "net farm income from the certified

commodity." Had Congress done so, there would have been a compelling case for interpreting the parallel regulatory term "net fishing income" in the same narrow fashion. However, Congress chose the broader terminology. Moreover, it did so in the context of a statute that contains several other provisions that are expressly limited to the particular certified import commodity. For example, the statute refers to the price of the certified commodity, 19 U.S.C. § 2401a(c)(1), increases of imports of articles like, or directly competitive with, the certified commodity, id. § 2401a(c)(2), the amount of the certified commodity covered by the producer's application for benefits and produced in the marketing year, id. §§ 2401e(a)(1)(A), 2401e(b)(1)(B), and the information and technical assistance given to the producer "in adjusting to import competition with respect to the adversely affected agricultural commodity," id. § 2401e(a)(1)(D). In this setting, where Congress expressly referred to the market for the particular commodities when it was appropriate to do so, the nearly inescapable inference is that when Congress used the broader term "net farm income," it meant to encompass income from all farm products, not simply adversely affected commodities; the same inference applies to the regulatory term "net fishing income." See Keene Corp. v. United States, 508 U.S. 200, 208 (1993), quoting Russello v. United States, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

The Supreme Court made the same point forcefully in a closely analogous setting in Patterson v. Shumate, 504 U.S. 753 (1992), a case involving the meaning of the term "applicable nonbankruptcy law." The petitioner in that case argued that the

term should be construed to refer exclusively to state law. In response, the Court pointed out that the natural reading of the term was not restricted to state law and that the Bankruptcy Code contains other references to sources of law in which it limits those sources to "state law." The Court then explained that the Code "reveals, significantly, that Congress, when it desired to do so, knew how to restrict the scope of applicable law to 'state law' and did so with some frequency. . . . Congress' decision to use the broader phrase 'applicable nonbankruptcy law' in [the provision at issue] strongly suggests that it did not intend to restrict the provision in the manner that petitioner contends." Id. at 758.

The same analysis applies here. In particular, it applies to Mr. Steen's argument that the references to "the adversely affected agricultural commodity" in subsections 2401e(a)(1), 2401e(a)(1)(A), and 2401e(a)(1)(D) indicate that the reference to "net farm income" in subsection 2401e(a)(1)(C) must be limited to net income from the adversely affected commodity. In fact, the opposite inference is stronger, as the "adversely affected agricultural commodity" language is conspicuously absent from subsection 2401e(a)(1)(C). Congress's use of that restrictive language in subsections 2401e(a)(1), 2401e(a)(1)(A), and 2401e(a)(1)(D) makes clear that it knew how to refer to particular commodities when it intended to limit the scope of the statute in that manner. Its choice of the facially broader term "net farm income" in a contiguous provision, subsection 2401e(a)(1)(C), seems plainly intended to convey a different, and broader, meaning.

B

In his brief, Mr. Steen argues that the background and underlying purpose of the statute make it evident that the term "net farm income" must be accorded a more

restrictive interpretation, even if the language of the statute does not compel that conclusion. But Mr. Steen's brief promises more than it delivers. The legislative history is devoid of any suggestion that the purpose of the statute requires "net farm income" to be read in the manner Mr. Steen suggests. As for the more general contention that a broad reading of the term would defeat the goals Congress set for the statute, Mr. Steen cites no persuasive evidence to that effect. Limiting statutory benefits to affected producers who experience a reduction in their "net farm income" from all commodities ensures that persons who do not suffer an overall loss in their farming (or fishing) income are not eligible for cash benefits under the adjustment assistance program. It is unsurprising that Congress would elect to provide cash benefits only to persons whose overall financial well-being has suffered as a result of import competition; those are the producers who have suffered the equivalent of a loss of employment, as is required under the other trade assistance provisions. See S. Rep. No. 107-134 at 33; 147 Cong. Rec. S6924 (daily ed. June 26, 2001) (statement of Sen. Conrad). Moreover, one of Congress's purposes in enacting the adjustment assistance statute was to enable persons potentially affected by import competition to adjust their production so as to avoid the impact of the competing imported goods. S. Rep. No. 107-134 at 33; see 19 U.S.C. § 401e(a)(1)(D). Because persons whose net income has risen may be said to have successfully adjusted to the competition from imports, there is no reason to suppose that Congress would want them to share in the cash benefits afforded under the statutory program.

In promulgating the regulations implementing the 2002 statute, the Department of Agriculture made precisely the same point. Responding to concerns that diversified

producers would be disqualified if their net earnings increased due to income from other commodities, the agency explained that such a result was consistent with the purpose of the statute, which was "to assist producers to adjust to imports by providing technical assistance to all and cash payments to those facing economic hardship." 68 Fed. Reg. at 50,048. The Department recognized that all members of the certified group have been sufficiently injured by increased import competition to merit some type of assistance, but it took the position, consistent with the statute, that only a subset are deserving of monetary benefits. Accordingly, neither the plain statutory language nor the overall purpose of the statute supports Mr. Steen's argument that the term "net farm income" should be read in the manner he proposes.

C

Even if the meaning of the term "net farm income" were not clear on its face and in light of its context, we would still reach the same conclusion in this case because Congress expressly delegated to the Secretary of Agriculture the responsibility to determine "net farm income" in the statutory formulation. The 1974 Trade Act gave the Secretary of Labor authority "to prescribe such regulations as may be necessary to carry out the provisions" of the Act, 19 U.S.C. § 2320, and the 2002 Trade Act gave the Secretary of Agriculture that authority with respect to the new provisions granting adjustment assistance for those engaged in agriculture, 19 U.S.C. § 2401(6). Moreover, the statute expressly granted the Secretary authority to define "net farm income" by referring to "net farm income (as determined by the Secretary)." Id. § 2401e(a)(1)(C). Because the Secretary acted pursuant to an express delegation of authority by Congress, and did so through formal notice and comment rulemaking, the

regulation is entitled to broad deference from this court. In <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 843-44 (1984), the Supreme Court addressed this situation directly and stated that in such cases judicial deference to the agency's regulation is very broad: "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." <u>See</u> <u>Nat'l Treasury Employees Union v. King</u>, 132 F.3d 736, 739 (Fed. Cir. 1998); <u>New York Guardian Mortgage Co.</u>, 916 F.2d 1185, 1191 (Fed. Cir. 1990); <u>see also</u> <u>Cathedral Candle Co. v. U.S. Int'l Trade Comm'n</u>, 400 F.3d 1352, 1363 (Fed. Cir. 2005). In this case, the Secretary's regulatory definition of the term "net farm income," as applied to fishing income, was reasonable and cannot be condemned as arbitrary, capricious, or manifestly contrary to the statute.

Mr. Steen argues that the Secretary's interpretation was not faithful to the statute because the regulation adopts the meaning of "net farm income" used in the Internal Revenue Code, rather than employing a definition not tied to another legal standard. We disagree that in determining what constitutes "net farm income" (or "net fishing income" under the regulations), the Secretary is barred from using the standards applied under the Internal Revenue Code as a basis for making that determination.

As part of his argument that the Secretary may not adopt the Internal Revenue Code standard for defining net farm income, Mr. Steen contends that the Secretary must make a case-by-case determination of net farm income consistent with the purposes of the Trade Adjustment Act, rather than "blindly relying on the IRS's

definition." We disagree that the regulation is impermissibly rigid or that it led the Department of Agriculture to commit legal error in this case. The Secretary relied on Schedule C of Mr. Steen's tax returns for 2001 and 2002 to determine his net fishing income. There is no suggestion that those documents include income from sources other than fishing. Thus, this is not a case in which reliance on tax returns has resulted in a determination that does not reflect the applicant's net income from all fishing sources. Decisions by the Court of International Trade in other cases suggest that income from other sources included in the pertinent tax returns should not be included as part of the calculation of "net fishing income." See Selivanoff v. U.S. Sec'y of Agric., No. 05-00374, 2006 Ct. Intl. Trade LEXIS 52, at *11 (Ct. Int'l Tr. Apr. 18, 2006) (appropriate for agency to interpret "net fishing income" to include all commercial fishing income and to exclude non-fishing income); Do v. U.S. Dep't of Agric., 427 F. Supp. 2d 1224, 1231 (Ct. Int'l Tr. 2006) (not proper to include gains or losses from the sale of business assets in determining "net fishing income"). Moreover, the regulations make it reasonably clear that the determination of net farm income or net fishing income is not to be made solely on the basis of tax return information if other information is relevant to determining the producer's net income from all farming or fishing sources. The regulations provide that, in certifying a loss in net farm or fishing income, the producer shall provide either supporting documentation from a certified public accountant or attorney, or relevant documentation and supporting financial data, such as financial statements, balance sheets, and reports prepared for or provided to the Internal Revenue Service or another U.S. government agency. 7 C.F.R. § 1580.301(e)(6). Thus, the regulations are not solely and inflexibly linked to the producer's tax returns for

this purpose.  In any event, because all of Mr. Steen's income at issue in this case came from fishing, we need not address in detail the circumstances in which other income or expenses may, or must, be considered in determining net fishing income.  It is enough to note that Mr. Steen does not contend that his tax returns distort the net amount of his income derived from all fishing sources in the two relevant years; those are the income figures that the statute and regulations require the Secretary to use in making the determination of eligibility for a trade adjustment award.

D

In addition to the arguments addressed above, Mr. Steen presents four arguments based on particular statutory or regulatory language to support his proposed construction of the statutory term "net farm income" and the corresponding regulatory term "net fishing income."  First, he argues that the Secretary's definition of "net farm income" and "net fishing income" conflicts with section 2401a(e)(2) of the Trade Act. That provision requires the Secretary to treat separate classes of goods within a single agricultural commodity as separate commodities for purposes of determining group eligibility, the national average price, and the level of imports.  19 U.S.C. § 2401a(e)(2). Mr. Steen contends that because the statute requires those determinations to be made on a commodity-by-commodity basis, it thwarts the statutory purpose to define "net fishing income" as including income obtained from all the producer's fishing activities. That argument, however, is a non sequitur.  The statute explicitly provides for commodity-by-commodity treatment for purposes of group certification, national average price, and the level of imports, but does not in any way indicate that determining whether a particular producer has had a net loss of income as a result of import

competition must likewise be determined based on a single commodity. To the contrary, it is perfectly sensible for the statute and the regulations to base certain eligibility criteria on imports and prices of a particular commodity, but to limit cash benefits to those suffering an overall loss of income from farming or fishing. Moreover, as noted above, the fact that the statute omits reference to the commodity-by-commodity approach when addressing "net farm income" supports the inference that such a limitation was not intended with respect to that provision. Accordingly, the Secretary's definition of "net fishing income" does not conflict with section 2401a(e)(2).

Second, Mr. Steen argues that the terms "net farm income" and "net fishing income" must be interpreted so as to ensure that imports are the principal cause of injury to the applicant farmer or fisherman. He grounds his argument on the use of the term "adversely affected agricultural commodity producer" in section 2401e to describe those eligible for monetary benefits. If "net farm income" or "net fishing income" included income from all farming or fishing activities, he argues, the statute would not require "proof that the person receiving benefits was adversely affected by the imports at issue." That argument fails, however, because nothing in the statute explicitly requires the producer to prove that his overall loss of income is attributable to the imports; nor is it "absurd," as Mr. Steen argues, to interpret the statute in the way the Secretary has done.

While it is true that under the Secretary's interpretation a producer whose loss of income from fishing is principally attributable to causes other than import competition could theoretically be eligible for cash benefits, the amount of the producer's benefits would still be based on the amount of the affected commodity he produced in the most

recent year and the reduction in the price of that commodity during that year. Those requirements make it unlikely that a producer would actually make money on the adversely affected commodity yet suffer a net loss of income overall so as to be eligible for cash benefits under the statute. And even in such a case, the producer would still have been better off in the absence of import competition, so the cash benefit would have the effect of making up for the difference in the income the producer earned from the commodity in question and the greater amount the producer would have earned in the absence of imports.

Third, Mr. Steen argues that the Secretary's definition of "net farm income" imposes an "extra-statutory" limitation on who can receive monetary benefits, since the statute already contains two explicit limitations—a limitation based on the producer's gross income and a limitation based on the producer's aggregate receipt of benefits under the trade adjustment assistance program. 19 U.S.C. § 2401e(a)(2). He claims that restricting those eligible for monetary benefits using the Secretary's definition of net income improperly contravenes Congress's intent by imposing a limitation on eligibility that goes beyond the explicit statutory limitations. This argument ignores the fact that a decline in "net farm income" is a statutorily mandated requirement and will invariably exclude producers who do not fail the enumerated limitations. The express statutory direction to the Secretary to limit eligibility to those who suffer a net loss in farm income demonstrates the flaw in Mr. Steen's argument that the only limitations on eligibility for cash benefits are the gross income and aggregate benefits limitations found in section 2401e.

Finally, Mr. Steen argues that the regulations implementing the 2002 amendment to the Trade Assistance Act apply "only to aquaculture, i.e., fish raised on farms" and that it is therefore improper "to permit benefits to be paid (or denied) based on a producer's non-aquaculture income." That argument is predicated on a misunderstanding of the scope of the regulations. The regulations make it clear that a fisherman whose fishing income (including non-aquacultural products) is adversely affected by imported aquacultural products is eligible for benefits. See 68 Fed. Reg. at 50,049; 7 C.F.R. § 1580.102. Thus, the term aquaculture, as used in the regulations, refers to the imported products and does not have the effect of restricting the scope of the term "net fishing income" for purposes of determining eligibility for benefits.

For these reasons, and for the reasons set forth in detail in the opinion of the Court of International Trade, we uphold the court's decision denying trade adjustment cash benefits to Mr. Steen.

Each party shall bear its own costs for this appeal.

AFFIRMED.