**Slip Op. 07-10**

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| KEVIN G. O'TOOLE, | : |
| *Plaintiff,* | : |
| v. | : Court No. 04-00660 |
| U.S. SECRETARY OF AGRICULTURE, | : |
| *Defendant.* | : |

[Plaintiff's Motion to Supplement the Administrative Record is denied, without prejudice.]

Dated: January 23, 2007

Munford Page Hall, II and Dorsey & Whitney LLP (Bo-Yong Park), for Plaintiff.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (John J. Todor and Delfa Castillo); Jeffrey Kahn, Office of the General Counsel, U.S. Department of Agriculture, Of Counsel; for Defendant.

**OPINION**

RIDGWAY, Judge:

In this action, plaintiff Kevin G. O'Toole – a salmon fisherman in Alaska – contests the decision of the U.S. Department of Agriculture ("USDA") denying his application for cash payments and other benefits under the Agricultural Trade Adjustment Assistance ("Ag-TAA") statute on the grounds that he failed to provide documentation establishing that his net fishing income in 2001 exceeded that for 2002. *See* CAR 1 (Plaintiff's "Application for Trade Adjustment Assistance (TAA) for Individual Producers," stamped by USDA "Received Jan 20 2004" and "Disapproved Oct 29 2004"); CAR 16 (Letter to Plaintiff from USDA, dated Oct. 29, 2004, notifying him of denial

of his application).[1]

Pending before the Court is Plaintiff's Motion to Supplement the Administrative Record, which urges both that O'Toole's federal income tax returns for 2001 and 2002 be added to the record, and that this matter be remanded to USDA for "additional fact finding on the basis of the supplemented agency record and, if necessary, further investigation." *See* Plaintiff's Supplemental Brief in Support of Plaintiff's Motion to Supplement the Administrative Record ("Pl.'s Supp. Brief") at 13.

O'Toole's principal argument is predicated on his claim that copies of the tax returns at issue were mailed to USDA well in advance of the agency's regulatory deadline. *See* Affidavit of Kevin G. O'Toole ("Affidavit") ¶ 4. According to O'Toole, under the common law "mailbox rule," timely receipt by the agency is therefore presumed. In the alternative, O'Toole argues that supplementation of the record and remand are warranted because USDA's consideration of his application failed to satisfy applicable standards. *See generally* Plaintiff's Motion to Supplement the Administrative Record ("Pl.'s Brief"); Plaintiff's Reply to Defendant's Opposition to the Motion to Supplement the Administrative Record ("Pl.'s Reply Brief"); Pl.'s Supp. Brief; Plaintiff's Supplemental Brief in Response to Defendant's Supplemental Memorandum in Opposition to Plaintiff's Motion to Supplement the Administrative Record ("Pl.'s Supp. Response Brief").

---

[1]The Administrative Record filed with the Court is confidential and consists of 12 documents, totaling 16 pages. Citations to the record herein are to specific pages, and are noted as "CAR ____."

The Government opposes Plaintiff's motion. *See generally* Defendant's Memorandum in Opposition to Plaintiff's Motion to Supplement the Administrative Record ("Def.'s Brief"); Defendant's Response to Plaintiff's Motion for Leave to File a Reply ("Def.'s Brief in Opp. to Reply"); Defendant's Supplemental Memorandum in Opposition to Plaintiff's Motion to Supplement the Administrative Record ("Def.'s Supp. Brief"); Defendant's Opposition to Plaintiff's Supplemental Brief in Support of Plaintiff's Motion to Supplement the Administrative Record ("Def.'s Supp. Response Brief").

Jurisdiction lies under 19 U.S.C. § 2395 (Supp. IV 2004).[2]  For the reasons set forth below, Plaintiff's Motion to Supplement the Administrative Record is denied, without prejudice.

## I.  Background

The Agricultural Trade Adjustment Assistance ("Ag-TAA") program is designed to assist eligible farmers and fishermen in adjusting to import competition, by providing technical assistance to all, and by offering certain additional benefits to those facing economic hardship. *See generally* 19 U.S.C. §§ 2401, 2401a-g (Supp. III 2003)[3]; USDA Fact Sheet, Trade Adjustment Assistance for

---

[2]*See* <u>Lady Kelly, Inc. v. U.S. Sec'y of Agriculture</u>, 30 CIT ____, ____ n.2, 427 F. Supp. 2d 1171, 1173 n.2 (2006) (summarizing history of court's subject matter jurisdiction over Ag-TAA cases).

[3]Except as otherwise noted, all statutory citations herein are to the U.S. Code (Supp. III 2003), which was in effect during the pendency of Plaintiff's application before USDA.

Limited changes were made to certain provisions, effective December 3, 2004 (after the denial of Plaintiff's application, and before the commencement of this action). *See* 19 U.S.C. §§ 2395, 2401, 2401a-g (Supp. IV 2004); Pub. L. No. 108-429, § 2004, 118 Stat. 2434 (Dec. 3, 2004).

Similarly, except as otherwise noted, all citations herein to the Code of Federal Regulations

Farmers (Aug. 2003) ("goal" of Ag-TAA program is "to help producers respond proactively to import competition through training, cash benefits, and employment services").[4]

In October 2003, USDA certified salmon fishermen in Alaska as eligible for trade adjustment assistance for the 2002 market year, based on the stiff competition they were facing from imported frozen salmon fillets. *See* Trade Adjustment Assistance for Farmers, 68 Fed. Reg. 62,766 (Nov. 6, 2003).[5] Among those covered by the group certification was plaintiff Kevin G. O'Toole, a salmon fisherman in Cordova, Alaska. O'Toole and all others covered by the certification were thus eligible to apply for Ag-TAA benefits.

In addition to the free technical assistance to which all applicants are entitled under the Ag-TAA program, applicants who satisfy certain criteria are also entitled to cash payments (known as a "trade adjustment allowance" or as "trade adjustment assistance payments"), as well as

---

are to the 2004 edition, which was in effect throughout the pendency of Plaintiff's application.

[4]The USDA Fact Sheet is available at http://www.fas.usda.gov/itp/taa/factsheet.htm (last visited Jan. 23, 2007).

For a succinct general overview of the Ag-TAA program, *see* Steen v. United States, 468 F.3d 1357, 1358-59 (Fed. Cir. 2006). As explained in greater detail there, the program involves a two-step process. First, a group of producers of a particular agricultural commodity must file a petition on behalf of all producers in their sector. If, based on the petition, the USDA determines both that commodity prices in the most recent marketing year were less than or equal to 80% of the national average price during the previous five marketing years, and that increased imports "contributed importantly" to the decline in prices, the group is certified as eligible to apply for Ag-TAA benefits. Individual producers covered by the group certification may then personally apply for benefits.

[5]USDA recertified the salmon fishermen the following year, but de-certified in 2005. *See* Trade Adjustment Assistance for Farmers, 69 Fed. Reg. 60,350 (Oct. 8, 2004); Trade Adjustment Assistance for Farmers, 70 Fed. Reg. 60,487 (Oct. 18, 2005).

"employment services and training benefits" provided through the U.S. Department of Labor.[6]   To

qualify for these additional benefits, an applicant's "net [fishing] income . . . for the most recent

year" must be "less than the [applicant's] net [fishing] income for the latest year in which no

adjustment assistance was received."   *See* 19 U.S.C. § 2401e(a)(1)(C);[7]  *see also* 7 C.F.R. §

1580.301(e)(4) (requiring certification of decline in net fishing income from that during pre-

adjustment year).[8]

---

[6]*See* 19 U.S.C. § 2401e(a)(1)(D) (eligibility for free technical assistance); 19 U.S.C. § 2401e(b) (eligibility for trade adjustment assistance payments); 19 U.S.C. § 2401e(d)(2) (eligibility for employment services and training benefits).

*See also* 7 C.F.R. §§ 1580.301(d), 1580.302(a)-(d) (eligibility for free technical assistance); 7 C.F.R. §§ 1580.301(e), 1580.303 (eligibility for trade adjustment assistance payments); 7 C.F.R. § 1580.302(e) (eligibility for employment services and training benefits).

In his Complaint, O'Toole emphasizes that it is the employment services and training benefits that are of greatest interest to him.  *See* Letter to U.S. Court of International Trade from Plaintiff (Dec. 21, 2004) ("MORE IMPORTANT to me than the loss of the specific cash payment . . . is the damaging effect that this determination has on my continued eligibility for *Re-training* in both this program and related programs which are now being offered to fishermen like me in Alaska. . . . I have been so excited and grateful for the opportunities this program would provide to help me get re-trained as my fishing livelihood has disappeared.  I intend to remain a productive citizen.").

[7]Those with adjusted gross incomes above a certain level are not eligible for cash payments (and thus also are not eligible for employment services and training benefits).  *See* 19 U.S.C. § 2401e(a)(2)(A).  The amount of the trade adjustment allowance paid to a successful applicant varies "based on the amount of the commodity produced by the applicant in the most recent marketing year and the amount by which the market price of the commodity has fallen during that year, relative to the average price during the previous five years."  Steen, 468 F.3d at 1359 (summarizing 19 U.S.C. § 2401e(b)).  An applicant's annual trade adjustment allowance is capped at $ 10,000 – and, according to USDA's website, is typically far less than the maximum.  *See* 19 U.S.C. § 2401e(c).

[8]As set forth below, the filing date of O'Toole's application was January 20, 2004; USDA's regulatory deadline for his submission of all supporting documentation was September 30, 2004; and USDA's letter denying his application was dated October 29, 2004.  Although the parties have not briefed the matter, it is assumed – for purposes of this opinion – that the case is governed by the Ag-TAA regulations promulgated in August 2003, as amended in November 2003.  *See* Trade

O'Toole submitted an Application for Trade Adjustment Assistance (TAA) for Individual Producers (Form FSA-229), which USDA timely received on January 20, 2004. *See* CAR 1-7; Affidavit ¶ 2. On February 9, 2004, he attended the mandatory technical assistance workshop offered by USDA in Cordova. CAR 8; Affidavit ¶ 5. Then, about a month later, he received a standard form "deficiency letter" from USDA, dated March 10, 2004. *See* CAR 9.

The USDA's deficiency letter advised O'Toole of the need to supplement his Form FSA-229 by submitting (1) "2001 Net Income Statement from Accountant or Copy of Schedule C of the IRS 1040, or IRS 1099 Misc." and (2) "2002 Net Income Statement from Accountant or Copy of Schedule C of the IRS 1040, or IRS 1099 Misc.," as well as (3) "Certificate of completing the technical assistance workshop." CAR 9; Affidavit ¶ 3. The letter cautioned that the "REQUESTED INFORMATION MUST BE RECEIVED IN [USDA's] ALASKA STATE OFFICE AS SOON AS

Adjustment Assistance for Farmers: Final Rule, 68 Fed. Reg. 50,048 (Aug. 20, 2003); Trade Adjustment Assistance for Farmers: Technical Amendments, 68 Fed. Reg. 62,731 (Nov. 6, 2003).

It is worth noting, however, that USDA amended its Ag-TAA regulations on November 1, 2004, revising (*inter alia*) the definition of "net fishing income" (7 C.F.R. § 1580.102), as well as the requisite language for an applicant's certification of a decline in net fishing income (7 C.F.R. § 1580.301(e)(4)), and adding a new subsection specifying the types of "[a]cceptable income documentation" (7 C.F.R. § 1580.502(a)(2)). *See* Trade Adjustment Assistance for Farmers: Final Rule; Technical Amendments, 69 Fed. Reg. 63,317-18 (Nov. 1, 2004).

To date, neither party has raised the question of the applicable version of the regulations. Nor does it appear that the matter would affect the narrow issues addressed in this opinion. It could affect other potential issues in the case, however. *See generally* Steen, 468 F.3d at 1359-60 ("Because [applicant's] application for benefits and the Secretary's action on that application were both completed before the regulations were revised in November 2004, [applicant] argues that the original version of the definitional regulation [7 C.F.R. § 1580.102], not the amended version, applies to his claim. The government does not expressly dispute that contention, and for purposes of this appeal we assume the earlier version of the regulation applies to [applicant's] application.").

POSSIBLE BUT NO LATER THAN SEPTEMBER 30, 2004." *Id*.

Enclosed with the deficiency letter was a notice captioned "Net Fishing Income Requirements." The notice stated: "Everyone must provide documentation that their net fishing income has declined in 2002, when compared to 2001. This is usually done by providing a copy of one of the following: Individual: Schedule C . . . . These must be provided for each year, and must show that it is for commercial fishing. If you did not file one of these forms in one, or both of the years, you may provide a statement from your accountant, or attorney as documentation. . . . Failure to provide this documentation by September 30, 2004 will result in your application being disapproved." CAR 10. Neither the deficiency letter nor the enclosed notice directed that the supplemental documentation should be submitted via registered mail, certified mail, or any other specific means of delivery. CAR 9-10; Affidavit ¶ 3.

In his affidavit, O'Toole attests that – "[s]ometime after receiving the March 10 letter, but well before September 30, 2004" – he responded to the deficiency letter via regular U.S. mail, sending USDA both his 2001 and his 2002 tax returns, as well as the required certificate of completion of the agency's technical assistance workshop. Affidavit ¶¶ 4-5 & Exhs. B-D.[9] He further attests that, "[a]lthough [he] do[es] not remember the exact dates when [he] mailed the tax returns and the Certificate," he "remember[s] that [he] mailed the two items separately at the

---

[9]Specifically, O'Toole states that the 2001 tax forms that he submitted included his Form 1040, "U.S. Individual Income Tax Return"; Schedule B, "Interest and Ordinary Dividends"; Schedule C-EZ, "Net Profit from Business"; and Schedule SE, "Self-Employment Tax." The 2002 tax forms included his Form 1040, "U.S. Individual Income Tax Return"; Schedule C, "Profit or Loss From Business"; Schedule SE, "Self-Employment Tax"; and Form 1099-MISC, "Miscellaneous Income." *See* Affidavit ¶ 4 & Exhs. B-C.

Cordova Post Office." Affidavit ¶ 6. In the affidavit, O'Toole explains, "Since my wife and I run a real estate agency in Cordova, both of us regularly visit the post office to do mailings." *Id.*

Although USDA timely received O'Toole's certificate of completion of the technical assistance workshop on March 30, 2004, the agency asserts that no tax returns were ever delivered. *See* CAR 8 (certificate of completion of technical assistance workshop, stamped by USDA "Received Mar 30 2004"); CAR 1 (notations on agency checklist, indicating receipt of certificate on "3-30-04," and checking "no" in response to question "Has the producer provided supporting documentation verifying that the net farm or net fish income declined from the latest year in which no adjustment assistance payment was received?"). By letter dated October 29, 2004, USDA notified O'Toole that his application had been "disapproved because [he] failed to submit required supporting documentation . . . by September 30, 2004." CAR 13.

On appeal, O'Toole seeks to prove USDA's timely receipt of his tax returns by invoking the "well settled" common law "mailbox rule," which holds that "if a letter properly directed is proved to have been either put into the post-office or delivered to the postman, it is presumed . . . that it reached its destination at the regular time, and was received by the person to whom it was addressed." Rosenthal v. Walker, 111 U.S. 185, 193 (1884); *see also*, *e.g.*, Hagner v. United States, 285 U.S. 427, 430 (1932); 2 Kenneth S. Broun, McCormick on Evidence 502 (Practitioner Treatise Series) (6th ed. 2006).

## II. **Analysis**

As a threshold matter, the Government emphasizes that, in Ag-TAA cases such as this, judicial review is confined to the administrative record. *See* Def.'s Brief at 3 (citations omitted). As the Government concedes, however, the record may be supplemented in certain limited circumstances, such as "when there is a 'reasonable basis' to believe that the agency's record of decision is materially incomplete." Def.'s Brief at 6 (citation omitted); Def.'s Supp. Brief at 4 (same).

According to O'Toole, this is just such a case. The administrative record here does not include the tax returns which he asserts were mailed to USDA well before the regulatory deadline. And, as the Government notes, absent those tax returns, the agency could not find O'Toole entitled to Ag-TAA cash benefits. *See* Def.'s Brief at 8 (noting need for "net fishing income verification for both 2001 and 2002"). The record in this action is thus "materially incomplete" – *if*, through application of the common law mailbox rule, O'Toole can establish that his tax returns were received by USDA before September 30, 2004.[10]

_____

[10]At various points in his briefs, O'Toole casts his argument in terms that suggest that he believes that the envelope addressed to USDA enclosing his tax returns may have been lost in the mail. *See*, *e.g.*, Pl.'s Brief at 4 (asserting that "it is equitable for the USDA to bear the risk of postal error"); Pl.'s Supp. Brief at 3 (arguing that USDA's regulations do not "require a petitioner to . . . ensure the mail is received by the USDA," and that "[f]rom a risk allocation point of view, . . . it is equitable for the Defendant to bear the risk of postal error since the Defendant was in a position where it could have eliminated such risk by prescribing clearer instructions on the mailing methods"), 11 (asserting that "the remedial nature of the TAA program" and various court decisions in Ag-TAA cases "allocate the burden of postal errors, if they occur after the filing of the initial application, to the Defendant"); Pl.'s Supp. Response Brief at 1-3 (asking "who should be responsible if a postal error occurs?" and, *inter alia*, emphasizing that USDA did not "require[] the Plaintiff to use registered or certified mail to submit his Tax Returns" and arguing that it would be inconsistent with remedial purpose of statute to deny benefits to "an applicant whose application

Relying on the mailbox rule, O'Toole argues that the administrative record should be supplemented with his 2001 and 2002 tax returns, and that this matter should be remanded to USDA for further consideration. In the alternative, he asserts that he is entitled to the requested relief because USDA failed to adequately consider his Ag-TAA application.

### A. The Applicability of the Common Law "Mailbox Rule"

The applicability of the common law mailbox rule in a TAA case is an issue of first impression. As discussed in section I above, the mailbox rule raises a presumption that correspondence that is properly addressed, stamped, and mailed is received by the addressee in due course. *See*, *e.g.*, Rosenthal v. Walker, 111 U.S. at 193; Hagner v. United States, 285 U.S. at 430. And, as O'Toole emphasizes, the fact of mailing can be proved through evidence of mailing custom or routine practice (in lieu of "direct" proof of mailing). *See generally* Pl.'s Brief at 3 (*citing* United States v. Green, 745 F.2d 1205, 1208 (9th Cir. 1985); United States v. Brackenridge, 590 F.2d 810, 811 (9th Cir. 1979); United States v. Joyce, 499 F.2d 9, 15 (7th Cir. 1974); Stevens v. United States, 306 F.2d 834, 835 (5th Cir. 1962));[11] Pl.'s Reply Brief at 2-3; Pl.'s Supp. Brief at 7.

happened to be lost in [the] mail"). However, there is no need to reach the issue of the allocation of the risk of loss in the mail at this time. As discussed elsewhere herein, O'Toole has not established that the tax returns were properly mailed, which would – in turn – give rise to a presumption of receipt by USDA, under the common law mailbox rule. The issue of allocation of the risk of loss in the mail would become ripe only if that presumption were successfully rebutted. In any event, the risk of loss in the mail is not addressed by the common law mailbox rule (at least in its traditional formulation).

[11]*See* Green, 745 F.2d at 1208 (in mail fraud case, proof of mailing at issue established based on "testimony by a Bechtel employee that it was the routine at Bechtel for mail in the outgoing basket to be picked up and placed in the United States mail"); Brackenridge, 590 F.2d at 811 (in mail fraud case, proof of mailing at issue established by testimony of manager of bank's bank-by-

1.  The Relevance of Custom or Routine in This Case

The Government acknowledges that, for purposes of the mailbox rule, the fact of mailing can be established through proof of custom or routine.  *See* Def.'s Brief at 9 ("inference of mailing may be sufficiently supported by evidence of a routine custom, usages and practices") (*citing* Stevens, 306 F.2d at 835; Joyce, 499 F.2d at 15; Brackenridge, 590 F.2d at 811); Def.'s Supp. Brief at 6 ("the common law mailbox rule applies in the case of 'customs, usages and practices in the course of business'") (*citing* Stevens, 306 F.2d at 835).  But the Government contends that O'Toole's reliance on custom or routine in this case is misplaced.

O'Toole apparently has no clear recollection of mailing his tax returns to USDA.  Instead, he avers that the tax returns were posted in the course of regular mailings made in the operation of his family's real estate business.  Specifically, O'Toole attests:

---

mail department that "routine custom and practice for handling cross-country withdrawal requests would result in a mailing"); Joyce, 499 F.2d at 15 (in mail fraud case, "[m]ailing can be proved by office custom without producing as a witness the person who personally placed the letter in a United States mailbox"); Stevens, 306 F.2d at 835 ("positive and direct testimony that there was a placing in the mails" not necessary in mail fraud case; "showing of the customs, usages and practices in the course of business" suffices).

*See also*, *e.g.*, Godfrey v. United States, 997 F.2d 335, 338 (7th Cir. 1993) (and authorities cited there) (mailbox rule may be applied based on "proof of procedures followed in the regular course of operations which give rise to a strong inference that the [envelope] was properly addressed and mailed"); Reading Ventures, Ltd. v. United States, 987 F. Supp. 1315, 1320 (D. Col. 1997) (mailbox rule applied in tax case, based on testimony of corporation's accountant as to "mailing procedures followed in the regular course of operations of his business"); Tabor & Co. v. Gorenz, 356 N.E.2d 1150, 1153-54 (Ill. App. Ct. 1976) (mailbox rule successfully invoked in action for alleged oral contract for delivery of soybeans, based on buyer's "proof of the office custom with regard to the preparation, addressing, stamping, and mailing of confirmations," notwithstanding absence of "the direct testimony of . . . [a] person who claimed to have mailed the letters").

4. Sometime after receiving the March 10 letter [from USDA], I mailed the required tax returns to the [agency] by regular mail . . . .

5 . . . . Sometime after I had received the March 10 letter, but well before September 30, 2004, I mailed the Certificate [of completion of the USDA technical assistance workshop] to [USDA] by regular mail.

6. *Although I do not remember the exact dates when I mailed the tax returns and the Certificate, I remember that I mailed the two items separately at the Cordova Post Office. Since my wife and I run a real estate agency in Cordova, both of us regularly visit the post office to do mailings.*

Affidavit ¶¶ 4-6 (emphasis added).

The Government objects that O'Toole cannot rely on the mailing customs or routines in his family's real estate business to prove the mailing of materials required to support his Ag-TAA application. *See generally* Def.'s Brief at 9-10; Def.'s Brief in Opp. to Reply at 3-4; Def.'s Supp. Brief at 6; Def.'s Supp. Response Brief at 5-6. According to the Government, "Mr. O'Toole's use of the post office in his real estate business is simply irrelevant when the mailing involved was not part of 'routine custom or practice' of that business." Def.'s Supp. Response Brief at 6.[12]

It is true – and no great surprise – that, in most (if not all) of the cases on point, the mailing in dispute concerned the same business in which the "routine custom or practice" was established. However, the Government has cited no authority for the proposition that reliance on routine mailing custom or practice is limited to such situations. Nor has the Government articulated any policy or legal rationale to support such a limitation. Indeed, the logical foundation for the use of custom or

---

[12]The Government's argument is tantamount to a claim that a TAA applicant can never rely on mailing routine or custom, because – as O'Toole observes – "[n]o one is in the 'business' of 'mailing . . . net fishing income information to [USDA] to support TAA applications in connection with salmon production.'" *See* Pl.'s Reply Brief at 2-3 (*quoting* Def.'s Brief at 9-10); Pl.'s Supp. Brief at 7-8.

practice to establish the fact of mailing is *not* the nature of the document mailed, but – rather – the routine, regularity, and reliability of the mailing procedure itself.  *See generally* Pl.'s Brief at 3-4; Pl.'s Reply Brief at 2-3; Pl.'s Supp. Brief at 7-8.  The Government's argument thus misses the mark.

### 2.  The Sufficiency of Plaintiff's Affidavit

Quite apart from its claim that, as a general principle, routine business mailing procedures cannot be used to establish the mailing of tax returns to USDA, the Government also attacks the substantive sufficiency of the O'Toole Affidavit – both as to proof of mailing custom or routine, and more generally.

As the Government notes, courts within the Federal Circuit have had occasion to address – in a range of different types of cases and procedural contexts – the level of detail required in statements proffered to prove the fact of mailing.  *See* Def.'s Supp. Brief at 7-8 (*citing* Freeze v. U.S. Dep't of Veterans Affairs, 65 M.S.P.R. 149, 152 (1994); Lynch v. Merit Systems Protection Board, 152 F.3d 942 (unpublished), 1998 WL 96455 at * 2 (Fed. Cir. 1998); Duran-Arcelay v. Office of Personnel Management, 70 M.S.P.R. 13, 16 (1996); McIlvaine v. United States, 23 Cl. Ct. 439, 442-43 (1991); Davis v. United States, 43 Fed. Cl. 92, 94-95 (1999), *aff'd*, 230 F.3d 1383 (unpublished), 2000 WL 194111 (Fed. Cir. 2000)); Def.'s Supp. Response Brief at 2-3.[13]

---

[13]*See* Freeze, 65 M.S.P.R. at 152 (Merit Systems Protection Board will treat pleading as filed on date it is placed in mail stream – even if it is never received by the Board – where party "present[s] specific details concerning the mailing"; in case at bar, although the "sworn statement" of appellant's representative attested that "the petition was addressed to the Board, it [gave] no specifics concerning the mailing of the petition" and stated only that appellant's representative "was 'informed and believes' that a properly addressed petition for review . . . with postage prepaid was deposited in the mail," and was thus "too vague and general to show that the petition was actually mailed before the filing deadline"); Lynch, 152 F.3d 942 (unpublished), 1998 WL 96455 at * 2

(holding that "it was permissible for the Board to conclude that [appellant] had not met her burden to establish the predicate fact of mailing," where evidence was limited to attorney's "common practice"); Duran-Arcelay, 70 M.S.P.R. at 16 (where "appellant averred, in pertinent part, that he submitted a petition for review via FAX 'shortly after' receiving the [agency's] initial decision, that he has not been able to locate the FAX transcript showing the date and time of faxing, and that he has 'the letter sent by FAX but not the transcript,'" statement was "too vague and general" where "[t]here [was] nothing specific concerning the time or date the submission was allegedly faxed, and no copy of the petition for review that was allegedly faxed"); McIlvaine, 23 Cl. Ct. at 442-43 & n.3 (even if jurisdiction's law permitted "circumstantial proof of mailing beyond the exceptions provided in [the federal tax statute]," evidence insufficient where taxpayers "presented no evidence other than their own testimony" as to date of mailing of tax return, and "presented no evidence of proper preparation, addressing or mailing of their . . . tax return"; asserting that those jurisdictions that apply common law mailbox rule in tax cases "require strong circumstantial evidence to prove mailing"); Davis, 230 F.3d 1383 (unpublished), 2000 WL 194111, *aff'g*, 43 Fed. Cl. 92 (timely mailing not established in tax case, notwithstanding taxpayer's deposition testimony that he "(1) placed the [tax form] into a legal size white envelope; (2) addressed the envelope by hand; (3) brought the envelope to the . . . post office because he could not find a stamp at home; and (4) watched the postal clerk who was on duty affix a stamp to the envelope, cancel the stamp, and then put the envelope into a bin"; "[t]he common law mailbox rule has no application" in tax cases in Federal Circuit).

Although none of the cases on which the parties rely mirrors the case at bar, they are generally sufficiently analogous for the limited purposes for which they are cited here. The type of case and the procedural context is by no means irrelevant, however.

For example, it appears that – in contrast to the common law mailbox rule – the MSPB rule does not permit mailing to be established by "routine practice" alone, and instead requires "specific details" proving that the actual mailing at issue was deposited into the stream of U.S. mail. *See*, *e.g.*, Lynch, 152 F.3d 942 (unpublished), 1998 WL 96455 at * 2. (No similar requirement exists here.) On the other hand, under the MSPB rule, once the fact of mailing is established, receipt is conclusively presumed and *cannot* be rebutted. *See* Lynch, 152 F.3d 942 (unpublished), 1998 WL 96455 at * 2 (*citing* Gaydon v. U.S. Postal Service, 62 M.S.P.R. 198, 202 (1994) (if a pleading is properly addressed with postage prepaid and placed in the Postal Service mail stream, it is treated as filed on the date it was placed in the mail, *regardless of whether the Board ever receives it*)). The value of MSPB cases as precedent in this action is accordingly limited.

Similarly, both parties rely on a line of cases involving mail fraud prosecutions. *See*, *e.g.* Pl.'s Brief at 3 (*citing* Stevens, 306 F.2d at 835; Green, 745 F.2d at 1208; Brackenridge, 590 F.2d at 811; Joyce, 499 F.2d at 15); Def.'s Brief at 9 (same). In such cases, however, the issue generally is not whether or when a document was delivered, but – rather – simply whether a document was

mailed through the U.S. Postal Service (as opposed to some other mode of delivery, such as delivery by hand in person, or through some commercial express delivery service).

The parties rely on tax cases as well. *See* Pl.'s Supp. Brief at 5-6 (*citing* Sorrentino v. IRS, 383 F.3d 1187 (10th Cir. 2004); Lewis v. United States, 144 F.3d 1220 (9th Cir. 1998); Reading Ventures, 987 F. Supp. 1315)); Def.'s Supp. Brief at 8 (*citing* McIlvaine, 23 Cl. Ct. 439; Davis, 43 Fed. Cl. 92, *aff'd*, 230 F.3d 1383 (unpublished), 2000 WL 194111). However, many of the tax cases that address the common law mailbox rule devote substantial attention to a split in the Circuits as to whether that rule is effectively preempted by a specific provision of federal tax law. *See*, *e.g.*, Davis, 230 F.3d 1383 (unpublished), 2000 WL 194111 at * 2 (summarizing division among Circuits as to effect of 26 U.S.C. § 7502). Cases from those jurisdictions where the tax statute has been held to supplant the common law mailbox rule arguably offer little more than *dicta* as to the common law rule. Moreover, in some of the tax cases, the analysis and interpretation of mailbox rule precedent from other jurisdictions is less than entirely accurate. *Compare* Davis, 43 Fed. Cl. at 95 n.5, *aff'd*, 230 F.3d 1383 (unpublished), 2000 WL 194111 (emphasizing facts of Anderson v. United States, 966 F.2d 487 (9th Cir. 1992), as setting high threshold for evidence required to invoke presumption of receipt in 9th Circuit, a jurisdiction where common law mailbox rule applies in tax cases) *with* Lewis, 144 F.3d at 1223 (9th Circuit cautions that Anderson should not be read in overly "wooden way," that Anderson is not confined to its "unusual" facts, and that – to the contrary – "Anderson stands for the broad rule that if a taxpayer furnishes credible evidence of the date her letter to the [IRS] was postmarked, that date is the date that controls"). *See also* Schikore v. BankAmerica Supp. Retirement Plan, 269 F.3d 956, 964 (9th Cir. 2001) (*citing* Lewis as holding that "a sworn statement is credible evidence of mailing for purposes of the mailbox rule"). For these reasons and more, the tax case law too must be read and applied with great care, and cannot simply be imported wholesale into Ag-TAA cases such as this.

Finally, it bears noting that a close reading of the case law on the mailbox rule suggests that the rule's application in particular areas of the law is, in certain respects, colored by policy or other considerations specific to those individual areas of the law. *Cf.* Schikore, 269 F.3d at 962-64 (holding, *inter alia*, that the mailbox rule is to be interpreted and applied in light of purpose of statutory scheme at issue, and that "[t]he common law mailbox rule is consistent with the purposes of ERISA and applies to ERISA plans when receipt [of a document] is a factual issue in dispute"; "the application of the mailbox rule to an ERISA plan's benefit decisions must be done in a manner consistent with the purposes of ERISA, the central purpose of which is to 'protect the interests of participants in employee benefit plans and their beneficiaries'"). So too, in interpreting and applying the mailbox rule in cases such as this, the remedial purpose of the Ag-TAA statute must be borne in mind.

a. <u>The Sufficiency of Proof of Custom or Routine</u>

O'Toole's affidavit here simply is not sufficient to trigger application of the mailbox rule.

For example, although the affidavit alludes generally to the real estate business that his family

operates (and although his briefs amplify the matter somewhat),[14] O'Toole "does not state in his

affidavit that he used any of the practices of his [real estate] business to mail the tax returns" at

issue. Def.'s Supp. Brief at 6. And, although the point is raised in his briefs,[15] there is nothing in

the Affidavit to the effect that "the [family's] real estate business has a practice of mailing personal

and business letters together." Def.'s Supp. Response Brief at 5 (*quoting* Pl.'s Supp. Brief at 8).[16]

Equally problematic is the Affidavit's silence on the specifics of the real estate business's

---

[14]Although it is not expressly stated in his affidavit, O'Toole explains in one of his briefs that he "is a fisherman during the fishing season. In off-seasons, [he] helps run his family real estate business." Pl.'s Reply Brief at 3. Indeed, on his 2001 Schedule C-EZ, O'Toole's "[p]rincipal business or profession" is listed as "Fisherman/Real Estate Sales." *See* Affidavit, Exh. B. This suggests that O'Toole may fairly be viewed as having *two* businesses – real estate and fishing.

[15]*See* Pl.'s Supp. Brief at 8 ("When one runs a small family business, the distinction between personal matters and business matters is often tenuous. One cannot expect the Plaintiff to make an extra trip to the post office to do his personal mailing separately from his real estate business mailings.").

[16]Indeed, although the Affidavit refers to the custom and routine of mailing only in the context of O'Toole's *real estate business*, it is at least possible that the same custom and routine is followed for the handling of mail associated with O'Toole's *fishing business* (assuming that such mail exists). In other words, it is at least possible that mail related to O'Toole's fishing business is handled using the same routine as the family's real estate business (and any personal mail).

If that were true, the Government presumably would have no objection to O'Toole's reliance on custom and routine in this case – because his asserted mailing of the tax returns to USDA would have been made in accordance with the custom and routine in his *fishing* business, and it is that fishing business that is the subject of his Ag-TAA application. *See generally* section II.A.1, *supra* (addressing Government's argument that "Mr. O'Toole's use of the post office in his real estate business is simply irrelevant when the mailing involved was not part of 'routine custom or practice' of that business.").

mailing custom or routine.  The Affidavit includes no details on matters such as whether the real estate business's office is located in or near O'Toole's home; whether some or all of the business's outgoing mail is temporarily held in a particular intra-office location (such as an "out box") designated for that purpose; whether the business meters its own mail, maintains a store of stamps, or buys postage at the post office for each envelope or package that it mails; how often (and how consistently and reliably) mail is taken to the post office (the days of the week, the times of day, etc.); whether anyone other than O'Toole and his wife work in the real estate business/office; what factors determine who takes the mail to the post office on a particular day; whether mail is deposited into a receptacle at the post office or taken to a service window, or both; whether O'Toole and his wife pick up incoming business (and/or personal) mail from the post office at the same time they deposit outgoing mail; whether O'Toole's incoming mail (business and/or personal) is delivered to his home by the U.S. Postal Service, or whether he rents one or more post office boxes (at the post office or elsewhere) for business or personal use; whether O'Toole maintains a mailing address for business purposes separate from his personal, home address; whether (and, if so, to what extent and how) O'Toole commingles or segregates business versus personal mail; whether O'Toole adheres to the same custom or routine in handling outgoing (and incoming) fishing-related mail and/or personal mail as he does in handling mail related to the real estate business; the extent to which O'Toole's mailing custom or routine varies based on the inherent schedules of O'Toole's businesses (such as during fishing season); and other similar matters.[17]

---

[17]*See*, *e.g.*, Reading Ventures, 987 F. Supp. at 1320 (accountant's deposition testimony "establish[ed] the mailing procedures followed in the regular course of operations of his business," including collection of mail in a "receptacle in his office that was used to deposit outgoing mail,"

b. Sufficiency in General

Besides highlighting the deficiencies in the evidence of mailing custom or routine, the

Government also challenges the Affidavit's sufficiency on more basic points. As the Government

points out, the Affidavit includes "no specifics as to the time or manner of mailing,"[18] and does not

even allege that O'Toole's tax returns were "properly addressed" to USDA. Def.'s Brief at 10;

Def.'s Supp. Brief at 6; Def.'s Supp. Response Brief at 2. The Affidavit is essentially devoid of

"details concerning the mailing other than [O'Toole's] recollection of having mailed his tax returns

---

a routine that "either he or 'someone in the office' did the mailing and there were only three persons [the accountant, his father, and a secretary] working in the office," and a practice that mail was deposited either in "the mailbox located 20 yards outside the office or delivered to the post office"); Green, 745 F.2d at 1208 (mailing established by testimony of Bechtel employee as to office "routine custom and practice," attesting that correspondence was placed in office's "outgoing mail basket," and that it was office practice "for mail in the outgoing basket to be picked up and placed in the United States mail"); Joyce, 499 F.2d at 17 (bank assistant vice president testified that, when mail was placed in the "outbox . . . for the mail," "the bank's mail boys would 'pick it up, . . . run it through the postage meter and then . . . bag the mail and take it to the Oak Street Post Office'"), 18 (executive testified that "he or his secretary would take outgoing mail to the post office at the end of each day"); Phillips v. Riverside, Inc., 796 F. Supp. 403, 406-07 (E.D. Ark. 1992) (mailbox rule not applicable in absence of, *inter alia*, "description of normal office procedures for placing . . . letters in the hands of the Postal Service"); Godfrey, 997 F.2d at 338-39 (IRS failed to trigger presumption of delivery, where sole evidence proffered was "computer transcript" of taxpayers' account, and there was no evidence of the "operating procedures" of the IRS or any other entity involved in issuance of refund checks).

[18]*But see* Schikore, 269 F.3d at 959, 964 (mailbox rule successfully invoked where "sworn declaration" attested only to *month* and year of asserted mailing); *see also* Sorrentino, 383 F.3d at 1195 (where plaintiff testified only that document was mailed "sometime during the first five days of March" in year at issue, mailbox rule not invoked – not due to lack of testimony as to exact date of mailing, however, but because of lack of corroboration). The mailbox rule thus can be successfully invoked even in cases where the actual date of mailing cannot be pinpointed.

at some point between March 10, 2004, and September 30, 2004." Def.'s Supp. Response Brief at 2.[19]

In certain contexts, custom or routine alone may constitute sufficient proof that an envelope was properly addressed, that adequate postage was affixed to the envelope, and that the envelope was placed in a pre-designated location for eventual deposit with the U.S. Postal Service. *See*, *e.g.*, Brackenridge, 590 F.2d at 811 (no direct proof of mailing required where employee of bank-by-mail department initialed check at issue, and testimony of department manager "established that routine custom and practice for handling cross-country withdrawal requests would result in a mailing"). However, nothing that O'Toole has cited suggests that proof of custom or routine alone should suffice in a case like this.[20]

Under the circumstances, it seems only reasonable to expect O'Toole to adduce testimony addressing at least *some* of the specific facts of the preparation and handling of the mailing at issue

---

[19]The Government also criticizes the Affidavit because it does not explain "how it is that [USDA] received [O'Toole's] TAA technical assistance certification, but not [the tax returns documenting] his net fishing income decline." *See* Def.'s Brief at 10. The Government's point would make sense only if O'Toole averred that the tax returns and the Certification were mailed in the same envelope. To the contrary, as discussed above, the Affidavit states not only that the documents were mailed "separately," but also that they were mailed on different "dates." *See* Affidavit ¶ 6. O'Toole thus postulates that the tax returns were either delivered to USDA and misplaced thereafter, or they were lost in the mail.

[20]*See generally* State Bank of East Moline v. Standaert, 82 N.E.2d 393, 396 (Ill. App. Ct. 1948) (noting that "[t]he courts have taken cognizance of the intricacies and expansion of business enterprises, and the cases reveal a liberalizing tendency with reference to the proof required to establish the posting of a letter.").

here.[21] *See*, *e.g.*, Reading Ventures, 987 F. Supp. at 1320 (although accountant could not recall exactly who actually took the outgoing tax returns to be mailed on day at issue, fact of mailing was successfully established by accountant's testimony detailing "mailing procedures followed in the regular course of operations of his business"; however, accountant also testified to specific details of other aspects of the actual transaction at issue, leading up to the deposit of the documents with the U.S. Postal Service – *i.e.*, accountant testified that he delivered tax return to corporate officer for his signature; that corporate officer signed the return in presence of accountant and returned it to him; and that accountant then placed return in envelope properly addressed to IRS in Utah, applied proper metered postage to envelope, and placed envelope in office's designated "out box"

---

[21]Such matters might include, for example, the measures taken to obtain and make copies of the tax returns (that is, whether O'Toole had the tax returns on hand, or had to request copies from his accountant or other professional), who took those measures, and whether anyone else can attest to the measures; whether a note or letter was enclosed with the tax returns (and, if so, whether O'Toole retained a copy for his files); the preparation of the envelope, including the address to which the envelope was directed, whether the envelope included a return address, and – if so – what that address was; if the envelope included a return address, confirmation that the envelope with the tax returns enclosed was never returned to O'Toole as "undeliverable"; who prepared the envelope for mailing; whether anyone else witnessed the preparation or handling of the envelope; whether the envelope was temporarily held in a particular intra-office collection location used for business purposes by the family's real estate agency; the extent to which the process used to mail the tax returns was the same as the process used to mail O'Toole's certificate of completion of the technical assistance workshop (which was, in fact, received by USDA); when, where, and how proper postage was affixed to the envelope, and by whom; the bases for O'Toole's apparent confidence that he – and not his wife – "mailed the required tax returns" (*see* Affidavit ¶¶ 4, 6); a rough approximation of the timing of the mailing of the tax returns (for example, whether the tax returns were mailed the same day that the envelope was prepared, whether the tax returns were mailed before or after the certificate of completion of the USDA technical assistance workshop (which was received by USDA on March 30, 2004), whether the tax returns were mailed before or after April 15 (or other dates or events in 2004 of personal significance to O'Toole), the season of the year when the tax returns were mailed, etc.); whether any other letters or packages (personal or business) were mailed concurrently with the tax returns; and whether O'Toole told family, friends, or fellow fishermen (or anyone else who can attest to such a conversation) about the mailing of the tax returns; Etc.

used to hold outgoing mail).

### 3.  Corroboration of Plaintiff's Affidavit

The Government further asserts that even the most detailed "uncorroborated affidavit" cannot

alone trigger the mailbox rule's presumption of receipt.  The Government maintains that additional,

extrinsic "supporting evidence" or circumstantial evidence of some kind is also required.  Def.'s

Supp. Response Brief at 2; *see also* Def.'s Supp. Response Brief at 3-5 (arguing, *inter alia*, that

cases cited by Plaintiff do not hold "that an uncorroborated affidavit was sufficient to invoke the

mailbox rule," and asserting that additional "circumstantial evidence" is required); Def.'s Supp.

Brief at 6 (referring to "[O'Toole's] uncorroborated affidavit"), 8 (summarizing McIlvaine and

Davis, two tax cases that address sufficiency of an "uncorroborated affidavit" or "uncorroborated

testimony," and discuss need for additional "circumstantial evidence").[22]

---

[22]It is noteworthy that the Government cites no MSPB cases on this point.  Although the MSPB rule apparently requires direct evidence of mailing from someone with personal knowledge, there seems to be no requirement for any type of independent corroboration. *See generally* n.13, *supra*.

As the U.S. Court of Appeals for the Federal Circuit has acknowledged, testimony is – by definition – at the heart of mailbox rule cases, and some parties may be tempted "to shade the facts on affidavits by averring facts that are not truly within the affiant's recollection." Lynch, 152 F.3d 942 (unpublished), 1998 WL 96455 at * 3.  But, as the Court of Appeals sagely observed:

> [T]he same could be said of any rule that attaches negative consequences to a particular set of facts and whereby the truth can only be known by one party's recollection of the facts.  Whether the rule is positioned at one point or another, *the courts must nonetheless rely on the carrot-and-stick provided by honesty and good conscience on the one hand and a lively fear of perjury charges and their attendant consequences on the other*.

*Id*.; *cf.* 19 U.S.C. § 2401f(e) (material false statement and/or failure to disclose material fact for

However, as explained elsewhere (*see* note 13, above), the tax cases cited by the Government

are of limited utility here, due to differences in the contexts in which the mailbox rule is invoked.

Most importantly, both McIlvaine and Davis were brought in a jurisdiction which has held that a

specific provision of the tax statute supplants the common law mailbox rule. *See generally*

McIlvaine, 23 Cl. Ct. 439; Davis, 43 Fed. Cl. 92, *aff'd*, 230 F.3d 1383 (unpublished), 2000 WL

194111. Accordingly, to the extent that those cases address the quantum and type of evidence

required to invoke the mailbox rule, the discussions are largely *dicta*.[23]

The case law cited by the parties sheds relatively little light on the sufficiency of a "self-

serving" affidavit and when (if ever) corroboration is required in circumstances like these – though,

in a number of the cases, the court makes some allusion to the fact that the affidavit or testimony in

question was (or was not) supported by corroborating circumstantial evidence. *See*, *e.g.*, Reading

Ventures, 987 F. Supp. at 1321 (mailing of tax form in question corroborated by timely receipt of

other, related state and federal tax forms said to have been mailed on same date as tax form in

dispute); Tabor & Co., 356 N.E.2d at 1155 (corroboration included defendant's admission that he

had received "mailings made pursuant to the same business practice close in time to the transaction

in question," and the fact that "[t]he disputed letters, addressed and mailed in accordance with the

same practice, were not returned"); Sorrentino, 383 F.3d at 1195 (taxpayer's "self-serving testimony,

without corroborating evidence" deemed "insufficient to raise a presumption the IRS [timely]

purpose of obtaining or increasing Ag-TAA payments punishable by fine of up to $10,000 and/or one year in prison); 7 C.F.R. § 1580.504(e) (same).

[23]*See also* n.13, *supra* (explaining, *inter alia*, that Davis court's reading of case law from other jurisdictions may be overly restrictive).

received Taxpayers' 1994 tax return").[24]

O'Toole asserts that, in any event, there *is* corroborating evidence to buttress his affidavit – "a record of performance consistent with his sworn declaration." *See generally* Pl.'s Supp. Brief at 4-6 (*citing* Sorrentino, 383 F.3d 1187; Lewis, 144 F.3d 1220); Pl.'s Reply Brief at 3. O'Toole seeks to analogize this case to Lewis, a tax case in the 9th Circuit (one of the circuits which holds that the common law mailbox rule was not abrogated by the tax statute). O'Toole emphasizes the Lewis court's stern rebuke of the Government:

> [W]hen a taxpayer with an unblemished reputation for paying taxes produces circumstantial evidence supporting his word, the government needs *more than a skeptical smile* to support its doubt of his credibility.

Lewis, 144 F.3d at 1222 (*quoted in* Pl.'s Supp. Brief at 5) (emphasis added).

The taxpayer in Lewis had testified in his deposition that his federal tax form had been timely mailed to the IRS at the same time as his corresponding state tax form, which was timely received by the relevant state tax authorities. Lewis, 144 F.3d at 1221, 1223. Much like the taxpayer in Lewis, who had "an unblemished record for paying taxes" and who pointed to the receipt of his state tax form to bolster his claim that he timely mailed his federal tax form, O'Toole argues that his affidavit in this case attesting to the mailing of his tax returns to USDA is corroborated by his "history of timely filing [all other] materials for his TAA application" – *i.e.*, the application form

---

[24]*See also* Phillips, 796 F. Supp. at 406-07 (noting testimony of plaintiff's former employer that COBRA letter was sent to plaintiff at same time as COBRA letters addressed to two other former employees, who testified that they received their letters; representative of plaintiff's former employer also testified that no COBRA letters were returned to employer as undeliverable during year at issue). *But see* Schikore, 269 F.3d at 964 (squarely holding – in case with no corroborating evidence – that "a sworn statement is credible evidence of mailing for purposes of the mailbox rule") (citations omitted).

itself (Form FSA-229), as well as the requisite certificate of completion of the USDA technical assistance workshop. Pl.'s Supp. Brief at 5-6; *see also* Pl.'s Reply Brief at 3 (asserting that O'Toole has "proved himself as a good mailer" through his timely mailing to USDA of both the initial application and the Certificate, as well as "actively appealing the [USDA's] decision . . . to this court by mail").[25]

Invoking Lewis, as well as two other cases, O'Toole maintains that "[c]ourts have found that actual receipt of documents mailed in a similar manner and time as missing documents is enough to invoke the presumption of receipt." *See* Pl.'s Supp. Brief at 6 (*citing* Lewis, 144 F.3d at 1223; Reading Ventures, 987 F. Supp. at 1320; Tabor & Co., 356 N.E.2d at 1155). The Government seeks to distinguish the cases that O'Toole cites, emphasizing that – in all three – the related, "corroborating" documents were mailed "at the same time or close in time" to the documents in dispute. *See* Def.'s Supp. Response Brief at 4-5 (*quoting* Tabor & Co., 356 N.E.2d at 1155, which refers to defendant's admission of receipt of mailings made by plaintiff "close in time" to transaction there at issue). But "close in time" is a relative concept. Moreover, here, at least from the Affidavit, it is unclear just how close in time the certificate and the tax returns were assertedly mailed. *See* Affidavit ¶¶ 4-6. O'Toole's authority thus is not as readily dismissed as the Government suggests.[26]

_____

[25]*But see* Def.'s Brief in Opp. to Reply at 2-3 (arguing that "the fact that the training certificate was received does not, in any way, demonstrate that plaintiff's IRS tax forms were submitted to [USDA]," and labeling as "without merit" "Plaintiff's suggestion that, because he has successfully mailed other documents that were received, one can presume he also mailed the IRS forms at issue").

[26]The Government also makes much of Lady Kelly, and suggests that any corroborating evidence in this case pales by comparison. *See* Def.'s Supp. Brief at 5-6 (*citing* Lady Kelly, 30 CIT ____, 427 F. Supp. 2d 1171). However, the evidence proffered in Lady Kelly was simply a photocopy of an envelope from the Georgia Shrimp Association addressed to the owner of the

shrimping vessel at issue, which was presumed to have transmitted an Ag-TAA application form, and which bore a handwritten notation assertedly documenting the date on which the completed application was mailed to USDA. Lady Kelly, 30 CIT at ____ n.1, 427 F. Supp. 2d at 1173 n.1. Thus, contrary to the Government's claims, it is not at all clear that the evidence in the case at bar is "less than that rejected . . . in Lady Kelly." *See* Def.'s Supp. Brief at 6. Even more to the point, however, Lady Kelly involved the doctrine of equitable tolling – *not* the common law mailbox rule at issue here. *See* Lady Kelly, 30 CIT at ____, 427 F. Supp. 2d at 1174-77.

Relying in part on Lady Kelly, the Government underscores the importance of rigorously enforcing USDA's September 30 regulatory deadline for applicants' submission of documentation in support of Ag-TAA applications, to ensure that cash benefits can be promptly disbursed to all claimants who have been found to be entitled to receive them. *See* Def.'s Supp. Brief at 5-6 (*quoting* Lady Kelly, 30 CIT at ____, 427 F. Supp. 2d at 1177, which declined "to equitably toll a statutory deadline on the basis of . . . [an applicant's] self-serving photocopy," reasoning (*inter alia*) that "to rule otherwise would open a loophole in the TAA regime"). The Government warns that applicants should not be permitted to use the mailbox rule to "circumvent" Ag-TAA deadlines. *See* Def.'s Supp. Response Brief at 7-8; Def.'s Brief at 11.

But, unlike equitable tolling, the common law mailbox rule cannot create a "loophole" in USDA's September 30 regulatory deadline – because, unlike equitable tolling (which is a means of *excusing failure to comply* with a deadline), the common law mailbox rule is a means of *proving compliance* with the deadline, even where "actual receipt" is required. *See*, *e.g.*, Schikore, 269 F.3d at 961-62 ("[The mailbox rule] is a tool for determining, in the face of inconclusive evidence, whether or not receipt has actually been accomplished. Therefore, the application of the rule is not contrary to the . . . requirement of 'actual receipt' . . . . Rather, it helps establish whether actual receipt occurred."); *cf.* Pl.'s Supp. Brief at 10-11 (noting that Lady Kelly involved the initial filing of an Ag-TAA application, *not* the receipt of supporting documentation).

In sum, allowing an applicant who properly invokes the mailbox rule to have his Ag-TAA claim decided on the merits by USDA – based on a review of the relevant supporting materials – will do no violence to the statutory and regulatory scheme. *See generally* Van Trinh v. U.S. Sec'y of Agriculture, 29 CIT ____, ____, 395 F. Supp. 2d 1259, 1272-73 (2005) (holding that government's single-minded "focus on the regulatory deadline . . . contravenes the remedial purpose of the [Ag-TAA] statute"; the September 30 regulatory deadline "should not override the statute's purpose and was merely intended to help further goal of providing rapid relief" by "encourag[ing] producers to submit their information in a timely fashion"); Usery v. Whitin Machine Works, Inc., 554 F.2d 498, 501-02 (1st Cir. 1977) (rejecting Labor Department's argument that provision of TAA statute mandating agency decision within 60 days precluded agency from "tak[ing] any steps in furtherance of [an] investigation" after 60 day period expired; expressing "doubt that the time limitations [in the statute] were required to protect any interests other than those of the [TAA

Moreover, much like the taxpayer in <u>Lewis</u>, who was credited with his "unblemished reputation for paying taxes," O'Toole could here reasonably be viewed as an Ag-TAA applicant with a "consistent and good faith" record of "comply[ing] with the application process." *See* Pl.'s Supp. Brief at 6. His counsel observe: "It is hard to imagine that the Plaintiff had difficulty in mailing his Tax Returns or simply neglected doing so after completing all of the other processes required to obtain his benefits." *Id.* At least at first blush, the Government's claim that O'Toole's filing of all other application-related materials is of no corroborating value whatsoever is tough to

_____

statute's] beneficiaries," and emphasizing that "[t]he only conceivable purpose of the 60 day decision requirement was to further the Act's remedial goals by ensuring that there would be no long delays in the distribution of benefits. . . . It would be ironic indeed to convert this seemingly remedial provision into one which would have the effect of denying *any* benefit to *some* workers.") (emphases added); *see also* 7 C.F.R. § 1580.501 (authorizing waiver/modification of non-statutory deadlines and other program requirements in appropriate circumstances) (discussed in <u>Van Trinh</u>, 29 CIT at ____, 395 F. Supp. 2d at 1273); *cf.* Trade Adjustment Assistance for Farmers: Final Rule; Technical Amendments, 69 Fed. Reg. 63,317 (Nov. 1, 2004) (explaining, in background section of notice, that purpose of requiring individual applicants for Ag-TAA benefits to submit "documentation to support the amount of their production" at the time they submit their applications (rather than simply at any time before the September 30 deadline) is because "it establishes a fiscal obligation for each applicant, upon which the [USDA] builds its estimate of program expenditures and calculates prorated payments").

Of course, to the extent that USDA wishes to foreclose future cases like this and to ensure that all supporting documentation needed to reach a determination on an application is received well before the September 30 deadline (and has not been lost in the mail, for example, or delivered to but misplaced by the agency), there is much within the agency's power that can be done. Whether or not the agency is legally required to do so (*see* section II.B, *infra*), there can be little doubt that sending follow-up deficiency letters or contacting applicants by other means to advise them of documentation still missing from their files would minimize – if not eliminate – cases such as this. In addition, advising applicants to obtain official proof of mailing (or even to request an official "return receipt"of delivery) would go a long way toward minimizing litigation, and would likely simplify any cases that are filed.

swallow.[27]

The infirmities in the instant Affidavit render it unnecessary to definitively resolve these questions at this time. Whether additional evidence is required to corroborate an affidavit of mailing in a case such as this, and – if so – whether the timely filing of all other application-related materials constitutes corroboration, are matters best reserved for another day, and for more thorough briefing.[28]

### 4. Summary

In short, as the precedent cited by the parties amply illustrates, the sufficiency of the

---

[27]Relying on Ingman, the Government seeks to make much of USDA's March 10, 2004 deficiency letter to O'Toole, noting that it "provid[ed] the telephone and facsimile phone numbers for the Alaska [USDA] Office." *See* Def.'s Brief at 10 (*citing* Ingman v. U.S. Sec'y of Agriculture, 29 CIT ____, ____, 2005 WL 2138576 at * 5 (2005)); CAR 9. The Government queries "why [O'Toole] did not contact [USDA] to inquire about the status of his application." Def.'s Brief at 10.

But the Government's point is lacking in merit, and its reliance on Ingman is misplaced. According to his affidavit, O'Toole had no reason to contact USDA, because he did not "realize[] there was something wrong with his application" until after "[his] son and other fellow fishermen started receiving the TAA checks" – after the September 30 deadline had passed. Affidavit ¶ 4.

Not only did O'Toole have no apparent reason to contact USDA, he also was under no obligation to do so. Unlike the case at bar, Ingman involved a claim of equitable tolling, which requires a showing of due diligence. *See* Ingman, 29 CIT ____ at ____, 2005 WL 2138576 at * 5. Contrary to the Government's implication, there is no requirement that a plaintiff demonstrate the exercise of due diligence where, as here, the mailbox rule – rather than the doctrine of equitable tolling – is at issue.

*See also* n.26, *supra* (distinguishing instant case from another equitable tolling case, Lady Kelly, 30 CIT ____, 427 F. Supp. 2d 1171).

[28]*See generally* n.22, *supra* (quoting Federal Circuit's decision in Lynch, 152 F.3d 942 (unpublished), 1998 WL 96455 at * 3, discussing reliability of parties' sworn statements); *cf.* Sorrentino, 383 F.3d at 1197-99 (Seymour, dissenting) (questioning, on policy grounds, the wisdom of requiring corroborating evidence).

evidence required to invoke the mailbox rule must be determined based on the totality of the

circumstances, and on a case-by-case basis. On the basis of the existing briefing, it is not possible

to state precisely what evidence would be required to successfully invoke the rule in the case at bar

(much less to opine whether it might be possible for O'Toole to make the requisite showing). For

purposes of the pending motion, it is enough to say that the evidence proffered to date is not

sufficient.[29]

---

[29]Although the Court raised the issue with the parties in a teleconference, the parties' briefs did not directly address in any detail the scope of any potential remand to the agency. Nevertheless, the parties appear to be in agreement that – if O'Toole successfully invoked the mailbox rule – the proper course would be for the Court to remand this matter to USDA, for the purpose of allowing the agency to review O'Toole's tax returns, to determine what additional information (if any) is necessary, to make a determination as to whether O'Toole's net fishing income decreased in 2002 (compared to 2001), and to make a redetermination on his application.

See, e.g., Pl.'s Supp. Response Brief at 4 (requesting that the administrative record be supplemented with O'Toole's income tax returns, and that the matter be remanded to USDA "for additional fact-finding on the basis of the supplemented agency record and, if necessary, further investigation"); Def.'s Supp. Brief at 10-11 ("Even if the Court were to supplement the record, the proper remedy would be to remand the case back to [USDA] for a decision rather than making a decision in the first instance. If the record were supplemented with Mr. O'Toole's submitted tax return information, [USDA] would need to determine if this information establishes a decline in Mr. O'Toole's net fishing income from 2001 to 2002."); Def.'s Supp. Response Brief at 9-10 ("In the event the Court decides to supplement the record, we agree that the proper remedy would be remand rather than making a decision upon the substance of Mr. O'Toole's application in the first instance."); accord, Schikore, 269 F.3d at 960, 965 & n.11 (in mailbox rule case, because the issue is "not a question of discretion or the application of a standard" but simply "a legal determination that the courts must ultimately make," and where neither party sought remand to administrator, district court erred in remanding to administrator to allow administrator "to determine whether [plaintiff] had presented sufficient evidence of mailing to invoke a presumption of receipt," and, if so, whether the presumption had been sufficiently rebutted). But see Def.'s Supp. Brief at 1 (arguing that, "if the Court grants plaintiff's motion, the proper response would be to remand to the agency rather than decide upon the credibility of Mr. O'Toole's averments or the substance of the financial information submitted) (emphasis added).

B. The Adequacy of USDA's Consideration of Plaintiff's Application

At the eleventh hour, O'Toole advanced an alternative theory of his case. In the course of supplemental briefing ordered by the Court, O'Toole argues that – without regard to the mailbox rule – this action should be remanded to USDA for consideration of his tax returns "because the [USDA] failed to meet the threshold requirement of a reasonable inquiry and investigation regarding the Plaintiff's eligibility for the benefits provided by the TAA Program beyond Plaintiff's application documents." Pl.'s Supp. Brief at 2-3, 8-13.[30] According to O'Toole, "whether the Plaintiff's sworn affidavit and the mailbox rule . . . are sufficient evidence of mailing is almost an academic issue in this case. If the [USDA] had fulfilled its duty to investigate properly, this litigation would have been avoided." Pl.'s Supp. Response Brief at 3.

As it has in other recent Ag-TAA cases,[31] the Government flatly and categorically denies that USDA has *any* "affirmative duty to investigate individual producers' applications, as opposed to

_____

[30]*See also* Pl.'s Supp. Response Brief at 3-4; *cf.* Pl.'s Reply Brief at 3-4 (asserting, *inter alia*, that "Defendant's failure to investigate the eligibility of Plaintiff for TAA benefits exceeded the boundary of reasonableness," disputing Government's claim that USDA "has no duty to investigate . . . individual producers' applications," and claiming that USDA "would have easily obtained [the missing tax returns] with 'reasonable inquiry'").

To support its claim that USDA is subject to a "threshold requirement of reasonable inquiry" vis-a-vis individual applications, O'Toole relies on two leading Ag-TAA cases. *See* Pl.'s Supp. Brief at 2-3, 9-13 (*citing* Van Trinh, 29 CIT at ____, 395 F. Supp. 2d at 1267-69; Wooten v. U.S. Sec'y of Agriculture, 30 CIT ____, ____, 414 F. Supp. 2d 1313, 1316 (2006)); Pl.'s Supp. Response Brief at 3-4 (same).

[31]*See*, *e.g.*, Defendant's Response in Opposition to Plaintiff's Motion for Judgment Upon the Agency Record at 23, 25, Anderson v. U.S. Sec'y of Agriculture, No. 04-00655 (Sept. 9, 2005); Defendant's Memorandum in Opposition to Plaintiff's Motion to Supplement the Record at 11-12, Wooten v. U.S. Sec'y of Agriculture, No. 05-00208 (Nov. 4, 2005).

group certifications." *See* Def.'s Supp. Brief at 2, 9-10; Def.'s Supp. Response Brief at 1-2, 6-9;

*see also* Def.'s Brief at 11-12. According to the Government, "[t]here is a clear distinction in the

statute and the regulation between [USDA's] duty to investigate agricultural commodity group

petitions, versus the review afforded individual producers' applications to determine whether

statutory and regulatory eligibility requirements are met." Def.'s Brief at 11. The Government thus

contends that "[a]lthough the statute and regulations give Agriculture the responsibility to

investigate group certifications, they create no such duty for individual applications." Def.'s Supp.

Response Brief at 6 (*comparing* 19 U.S.C. § 2401a(a) (requiring "investigation" of petitions for

group certification) *with* 19 U.S.C. § 2401e (listing "conditions" to be met by individual

applicants)). Indeed, the Government maintains that USDA's processing of individual applications

is intended to be nothing more than a "*pro forma* review." *See* Def.'s Brief at 12; Def.'s Brief in

Opp. to Reply at 4. *But see* 19 U.S.C. § 2401d(a) (requiring USDA to provide "whatever assistance

is necessary" in preparation of "applications for program benefits").[32]

---

[32]Although the storm clouds are brewing, no Ag-TAA opinion to date has squarely grappled with the distinction that the Government seeks to draw between group certifications and individual applications, or the Government's assertion that USDA is obligated to "investigate" only the former. *But cf*. Lady Kim T. Inc. v. U.S. Sec'y of Agriculture, 30 CIT ____, ____ & n.6, 2006 WL 3715909 at *4 & n.6 (2006) (although matter was remanded to USDA with instructions to "set forth an analysis demonstrating that [the agency] *determined*, rather than stated or referenced, Plaintiff's net income," court declined to "suggest that in reaching a determination, the [USDA] need conduct an independent exploratory investigation into the net income of a producer," and emphasized that agency "need only rely on the information submitted by the [applicant]"). Nor has O'Toole met the Government's arguments head-on in his briefs. And neither party's papers cited – much less addressed the meaning and significance of – 19 U.S.C. § 2401d(a).

In light of the disposition of the pending motion, there is no need to reach these issues at this time. If the instant motion is renewed, the parties will have the opportunity to research and brief the points more fully.

The Government notes that it "respectfully disagree[s]" with the holdings in the cases that O'Toole cites for the proposition that USDA's processing of individual applications is subject to a "threshold requirement of reasonable inquiry," but argues that – in any event – each of those cases is distinguishable from the case at bar. *See* Def.'s Brief at 12; Def.'s Supp. Brief at 9-10; Def.'s Supp. Response Brief at 6-7. The Government seeks to contrast those cases with this one, where "[USDA] not only determined whether Mr. O'Toole submitted the proper information, but also sent a deficiency letter stating which additional information was required." Def.'s Supp. Brief at 10; *see* Def.'s Supp. Response Brief at 7. Thus, the Government asserts, USDA in this case "met even the extra-statutory 'threshold of reasonable inquiry' for individual applications set forth in Wooten and Van Trinh, assuming the existence of such a threshold." Def.'s Supp. Brief at 10; *see* Def.'s Supp. Response Brief at 7.

Indeed, neither Van Trinh nor Wooten parallels this case in important respects. In Van Trinh, USDA had timely received both the applicant's certificate of completion of the USDA's technical assistance workshop and his tax returns. *See* Van Trinh, 29 CIT at ____, 395 F. Supp. 2d at 1261. The court remanded the matter to USDA for resolution of significant discrepancies and conflicting information in the applicant's file, and for consideration of his *amended* tax returns. Van Trinh, 29 CIT at ____, 395 F. Supp. 2d at 1269, 1274. In Wooten, the plaintiff asserted that USDA failed to send him a deficiency letter to notify him that required supporting documentation was missing from his file. Wooten, 29 CIT at ____, 414 F. Supp. 2d at 1315.[33]

---

[33]The Government similarly distinguishes this case from Anderson, another leading Ag-TAA case applying a "threshold of reasonable inquiry." *See* Def.'s Supp. Response Brief at 8-9 (*quoting* Anderson v. U.S. Sec'y of Agriculture, 30 CIT ____, ____, 429 F. Supp. 2d 1352, 1355-56 (2006)).

There is no dispute that USDA sent O'Toole just such a letter in this case. *See* CAR 9 (USDA deficiency letter to O'Toole, dated March 10, 2004, advising that tax returns and certificate of completion of USDA technical assistance workshop are missing from his file). But O'Toole asserts that USDA was required to do something more. Specifically, he contends that USDA should have sent him a second, follow-up deficiency letter – sometime after the March 10 deficiency letter, but before the September 30 deadline – advising that the requisite tax returns were still missing from his file. *See* Pl.'s Brief at 4; Pl.'s Reply Brief at 4; Pl.'s Supp. Brief at 10, 13. However, he cites no authority to support the existence of such an obligation.

Even more to the point, it is not at all clear that the duty that O'Toole seeks to impose would have made any difference in this case. Logically, a second deficiency letter from USDA would have alerted O'Toole to a problem only if he received that letter *after* he had mailed his tax returns (and after they should have been received by the agency). A second letter sent shortly after USDA's March 10, 2004 deficiency letter – or, indeed, at any point before O'Toole mailed the tax returns – would have served no purpose.

The duty that O'Toole would impose thus would not only require that USDA send a *second* deficiency letter; to be meaningful, the duty also would have to prescribe the *timing* of that second

As the Government notes: "In this case, unlike Anderson, there is no dispute between the parties that Mr. O'Toole received a deficiency letter from [USDA], whereas in Anderson the plaintiff claimed that 'he did not receive this notification until the final decision was already made.' . . . Furthermore, unlike Anderson, Mr. O'Toole only alleges that he mailed the tax information, not that he made 'attempts to rectify these discrepancies during the administrative process' via telephone conversations or facsimile transmissions as in Anderson." *Id.* Thus, the Government asserts, USDA here "met even the extra-statutory 'threshold of reasonable inquiry' applied in Anderson." *Id.*

letter in some fashion, or to require multiple letters – a topic that O'Toole fails to address. *Compare* Def.'s Supp. Brief at 10 (observing that "an additional deficiency letter" sent before O'Toole assertedly mailed his tax returns "would have provided no additional notice" of the problem with his file). Emphasizing its point with hyperbole, the Government notes that "[s]ome further action to obtain information is *always* possible," but USDA obviously cannot be required to send a "presumably infinite" number of deficiency letters to an Ag-TAA applicant. *See* Def.'s Supp. Response Brief at 7, 9 (emphasis added); Def.'s Supp. Brief at 9-10.

In sum, based on the briefs on file, O'Toole has failed to establish that USDA had a duty to send him a second deficiency letter. Nor has he demonstrated that his receipt of such a letter would have affected the outcome of his case in any way. However, that is not to say that the agency necessarily satisfied all of its legal obligations in this case. Because the pending motion is being denied without prejudice, O'Toole will have an opportunity to renew his motion based on further research and analysis of the statutes, regulations, and evolving case law.[34]

---

[34]As its parting shot, the Government asserts that "even the additional documentation Mr. O'Toole seeks to add to the record does not clearly establish a decline in net fishing income from 2001 to 2002." Among other things, the Government points out that O'Toole's tax return for 2001 states that it reflects combined income from "fisherman/real estate sales," while the 2002 return lists fishing alone, so that – according to the Government – "[n]o direct comparison . . . seems to be possible." *See* Def.'s Supp. Brief at 11; Def.'s Supp. Response Brief at 10. Two observations are in order here.

First, if O'Toole is inclined to renew the instant motion, the parties would be well advised to begin by conferring informally, and to jointly and carefully review all financial information potentially relevant to O'Toole's net fishing income, to assist him in making an informed decision as to whether to renew his motion, weighing, *inter alia*, the likelihood of his ultimate success on the merits. It goes without saying that all parties have an interest in conserving their own resources, as well as those of the Court.

And, second, to the extent that the Government may be implying that USDA is not obligated to look beyond O'Toole's income tax returns, recent case law suggests that the Government may be skating on thin ice. *See generally* Steen, 468 F.3d at 1363-64 (and cases cited there) (noting with approval that decisions from this court "suggest that income from other sources included in the pertinent tax returns should not be included as part of the calculation of 'net fishing income,'" and emphasizing that "the regulations make it reasonably clear that the determination of . . . net fishing income is not to be made solely on the basis of tax return information if other information is relevant").

*Accord*, Dus & Derrick, Inc. v. U.S. Sec'y of Agriculture, 31 CIT ____, ____, 2007 WL 54099 at * 8-10 (2007) (holding that USDA "may not rely solely on the information contained in plaintiff's tax return when other information is available," and instructing agency to allow plaintiff on remand to submit information to clarify net income reported in tax returns); Selivanoff v. U.S. Sec'y of Agriculture, 30 CIT ____, ____, 2006 WL 1026430 at * 3 (emphasizing "the need to make apples-to-apples comparisons between the claim year and pre-adjustment year figures," and noting that USDA's "rote reliance upon a single line item 'reported to the Internal Revenue Service' without further analysis, or, as necessary, further investigation will not suffice"), * 4 (observing that "[a] particular IRS form 1040's Schedule C may encompass two lines of business, one fishing and the other non-fishing . . . . But . . . it is only the net fishing income that is relevant"), * 6 (remanding matter to USDA, instructing agency to consider "any additional information that [plaintiff] may choose to submit, unsolicited, . . . in order to support his claim") (2006); Rood v. U.S. Sec'y of Agriculture, 29 CIT ____, 2005 WL 2086211 (2005), *sust'd after remand*, 30 CIT ____, 2006 WL 571977 (2006) (benefits awarded; where Schedule C that applicant submitted to USDA "appear[ed] to represent . . . wife's aerobic[s] business profit, not [applicant's] fishing business loss," agency reopened record (invoking "its discretion") to include correct Schedule C); *see also* Def.'s Supp. Response Brief at 10 (stating that, "if the Court decides that further investigation is necessary, the Court should remand to [USDA] *to determine what additional information is necessary*, *including* [but not limited to] *Mr. O'Toole's tax information*, to perform any further analysis of the record") (emphasis added).

*Compare* 7 C.F.R. § 1580.102 (defining "[n]et fishing income," in general, as "net profit or loss . . . reported on Internal Revenue Service Schedules C or C-EZ (Form 1040)"), *with* 7 C.F.R. § 1580.301(e)(6) (to establish decline in net fishing income, applicant may provide either "[s]upporting documentation from a certified public accountant or attorney" or "[r]elevant documentation and other supporting financial data, such as financial statements, balance sheets, and reports prepared for or provided to the Internal Revenue Service or another U.S. Government agency"). In November 2004, the regulations were amended to delete the references to specific IRS forms in the definition of "[n]et fishing income," and a new subsection was added to 7 C.F.R. § 1580.502: "Acceptable income documentation shall include, as appropriate, copies of Internal Revenue Service . . . Form 1040, U.S. Individual Income Tax Return; Schedule C (Form 1040),

### III.  Conclusion

For all the reasons set forth above, Plaintiff's Motion to Supplement the Administrative

Record in this action is denied, without prejudice.


_____/s/_____
Delissa A. Ridgway
Judge


Dated:   January 23, 2007
         New York, New York

---

Profit or Loss From Business . . . ."  *See* 7 C.F.R. § 1580.502(a)(2) (2005); Trade Adjustment Assistance for Farmers:  Final Rule; Technical Amendments, 69 Fed. Reg. 63,317 (Nov. 1, 2004).